```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
NATALIE O'LOUGHLIN and JULIA            :
O'LOUGHLIN,                             :
                Plaintiffs,             :
                                        :          OPINION AND ORDER
v.                                      :
                                        :          14 CV 2194 (VB)
USTA PLAYER DEVELOPMENT                 :
INCORPORATED, UNITED STATES             :
TENNIS ASSOCIATION INCORPORATED,        :
and USTA NATIONAL TENNIS CENTER         :
INCORPORATED,                           :
                Defendants.             :
--------------------------------------------------------------x
```

Briccetti, J.:

Plaintiffs Natalie O'Loughlin and Julia O'Loughlin bring causes of action for negligence, breach of fiduciary duties, and outrageous misconduct/infliction of emotional distress under Florida law, against defendants USTA Player Development Incorporated, United States Tennis Association Incorporated, and USTA National Tennis Center Incorporated (together "defendants" or "USTAPD"), alleging defendants caused or, at a minimum, exacerbated an eating disorder Julia O'Loughlin developed while participating in defendants' tennis program.

Before the Court is defendants' motion to exclude the testimony of plaintiffs' expert witness and for summary judgment, or, alternatively, to limit plaintiffs' damages claim. (Doc. #56).

For the reasons set forth below, the motion to exclude the expert's testimony is GRANTED in part and DENIED in part; the motion for summary judgment is DENIED; and the motion to limit plaintiffs' damages claim is DENIED.

The Court has subject matter jurisdiction under 28 U.S.C. § 1332.

**BACKGROUND**

The parties have submitted briefs, statements of fact ("SOF"), and declarations ("Dec'l"), with supporting exhibits, which reflect the following factual background.

Plaintiff Julia O'Loughlin ("O'Loughlin") is a talented tennis player. She is currently a 19 year-old student at the University of Denver, where she plays on the tennis team and receives a full athletic scholarship.

When she was 10 years old, O'Loughlin was admitted to and attended a full-time non-residential tennis training program for student athletes (the "day program") in Florida, operated by defendants, for the 2007-2008 academic year.

O'Loughlin also attended the day program for the first part of the 2008-2009 academic year, but not during the 2009 calendar year. She also did not attend the day program during the 2009-2010 academic year. She was re-admitted and attended the day program for the 2010-2011 academic year. Her aspiration, at least at the time, was to become a professional tennis player.

In November 2010, when O'Loughlin was 13 years old, she met with a nutritionist hired by defendants at the day program, who suggested O'Loughlin should lose eight to ten pounds. Sometime in the next week to several months after this meeting, O'Loughlin began to exhibit symptoms of Bulimia nervosa ("bulimia"), an eating disorder. Specifically, she began "purging." (Pls.' Response to Defs.' SOF ¶ 13). Defendants were first made aware of O'Loughlin's purging behavior in February or March 2011, when O'Loughlin told a friend about it during a trip to California for two tennis tournaments, and her friend in turn told O'Loughlin's coach.

In March 2011, O'Loughlin's mother (plaintiff Natalie O'Loughlin) took O'Loughlin to the Renfrew Center of Florida ("Renfrew"), an eating-disorder treatment facility, where she had an initial consultation and received outpatient treatment until May 2011.

For the 2011-2012 academic year, O'Loughlin applied for, and was accepted into, a residential program operated by defendants (the "residential program").

On a trip to Alabama for a tennis tournament in July 2011, a USTAPD coach allegedly would not allow O'Loughlin to eat certain food, "taunted her with unhealthy foods," and "only allowed her to have half a milkshake when their host family bought milkshakes for everyone." (Defs.' SOF ¶ 22).   O'Loughlin also alleges her USTAPD program coaches and trainers made her do additional workouts not required of other program participants during the summer of 2011.

In August 2011, O'Loughlin again disclosed to defendants that she suffered from symptoms of an eating disorder on a form she submitted in connection with her participation in the residential program.  Also in August 2011, O'Loughlin had a pre-participation physical with her pediatrician, who cleared her participation in the program without restriction.  She also had another physical exam with a different doctor around the same time.  She did not disclose her continued purging to either doctor.

In September 2011, defendants arranged for O'Loughlin to meet with another nutritionist. Based on height and weight information provided to the nutritionist from one of the program's coaches, the nutritionist suggested in an email to the coach that O'Loughlin may be 10-15 pounds overweight.  The coach agreed in an email response to the nutritionist that O'Loughlin needed to lose some weight.

During the fall of 2011, O'Loughlin alleges USTAPD coaches "limited her food intake, singled her out for additional workouts and were increasingly focused on her fitness, which [O'Loughlin] understood to be 'code' for her losing weight." (Defs.' SOF ¶ 31).

3

O'Loughlin alleges that in October 2011 she was "taken into a room and told by [three USTAPD coaches] that she must lose 20 pounds within two to three months or 'there will be consequences' [which was] interpreted by [O'Loughlin] as expulsion from the program." (Pls.' SOF ¶ U).

On November 10, 2011, O'Loughlin was taken to a local hospital and treated for dehydration. She returned to the residential program for approximately nine days. On November 19, 2011, O'Loughlin told her suitemate and her "dorm mother" that she had an eating disorder. (Defs.' SOF ¶ 41). The three of them then met with one of the USTAPD coaches and informed him about O'Loughlin's eating disorder as well. The coach told O'Loughlin to call her mother, which she did. The same day, O'Loughlin's mother picked her up from the program, and she did not return thereafter.

On November 30, 2011, O'Loughlin was re-admitted to Renfrew for thirty days of inpatient treatment, followed by outpatient treatment until February 20, 2012. O'Loughlin's treatment records reflect that in addition to her eating disorder, O'Loughlin "suffered from Obsessive Compulsive Disorder (OCD), depression, anxiety and low self-esteem." (Defs.' SOF ¶ 42). O'Loughlin also has "a family history of anxiety/bi-polar disorder (father), alcoholism and an eating disorder." (Id.).

In December 2012, O'Loughlin suffered a panic attack and psychotic breakdown, and in March 2013, she suffered a relapse of her eating disorder. Although she is apparently not currently suffering from her eating disorder, plaintiffs contend she "will always be at risk for relapse." (Pls.' Response to Defs.' SOF ¶ 53).

DISCUSSION

I.    Admissibility of Plaintiffs' Expert Testimony

Plaintiffs have proffered Kenneth L. Weiner, M.D., a psychiatrist who specializes in the treatment of eating disorders, including bulimia nervosa, to opine regarding the cause and exacerbation of O'Loughlin's bulimia while she was participating in defendants' residential program in 2011.

With two exceptions addressed separately below, defendants do not dispute Dr. Weiner's qualifications regarding the topics for which he has been engaged to testify, or the relevance of his testimony. Instead, defendants principally argue the methodology Dr. Weiner used to reach his conclusions fails to meet the reliability requirements of Fed. R. Evid. 702 as elucidated by Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993) ("Daubert").

The Court finds the methodology used by Dr. Weiner to be sufficiently reliable.

A.    Legal Standard

Rule 702 provides a witness "who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case."

"In Daubert, the Supreme Court articulated four factors pertinent to determining the reliability of an expert's reasoning or methodology: (1) whether the theory or technique relied on has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or

method has been generally accepted by the scientific community." Kass v. W. Bend Co., 2004 WL 2475606, at *4 (E.D.N.Y. Nov. 4, 2004), aff'd, 158 F. App'x 352 (2d Cir. 2005) (citing Daubert at 593-94).  However, these factors do not constitute a definitive checklist or test, and the admissibility of expert testimony depends on the particular circumstances of each case. Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 150 (1999).

"'The inquiry envisioned by Rule 702 is . . . a flexible one,' and 'the gatekeeping inquiry must be tied to the facts of a particular case.'" Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002) (quoting Daubert, at 594 and Kumho Tire, 526 U.S. at 150).

"Even in light of Daubert and its progeny, exclusion of expert testimony remains the exception rather than the rule.  Instead, '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" Qube Films Ltd. v. Padell, 2016 WL 888791, at *2 (S.D.N.Y. Mar. 1, 2016) (quoting Daubert, 509 U.S. at 596; other citations and quotations omitted).

Moreover, "in analyzing the admissibility of expert evidence, the district court has broad discretion in determining what method is appropriate for evaluating reliability under the circumstances of each case." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d at 265.  That discretion is particularly broad where the area of expertise in question is not a so-called "hard science." See E.E.O.C. v. Bloomberg L.P., 2010 WL 3466370, at *14 (S.D.N.Y. Aug. 31, 2010) ("Because there are areas of expertise, such as the social sciences in which the research, theories and opinions cannot have the exactness of hard science methodologies, trial judges are given broad discretion to determine 'whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case.') (quoting Kumho Tire, 526 U.S. at 153).  Still,

6

"nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the ipse dixit of the expert." Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

The proponent of expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. Baker v. Urban Outfitters, Inc., 254 F. Supp. 2d 346, 353 (S.D.N.Y. 2003).

Finally, it is appropriate for district courts to decide questions regarding the admissibility of expert testimony on summary judgment. Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997).

B. Dr. Weiner's Opinions

Here, Dr. Weiner has submitted a two-page report announcing six "opinions." In particular, Dr. Weiner concludes:

> 1. Due to the focus on weight loss in early 2011, the USTA/USTAPD precipitated [O'Loughlin's] eating disorder, Bulimia nervosa.
>
> 2. When the USTA/USTAPD accepted [O'Loughlin] back into their training program, this time in residence, they did not effectively communicate nor educate their coaches and trainers to the fact that [O'Loughlin] had struggled with purging behavior/Bulimia nervosa.
>
> 3. Coaches and trainers clearly focused on weight loss in an effort to improve fitness. [O'Loughlin] felt singled out and confused. This very clearly caused the exacerbation of her illness, resulting in a residential treatment stay at the Renfrew Center and withdrawal from the USTA/USTAPD training program.
>
> 4. With the manifestation of her eating disorder due to the actions of USTA/USTAPD coaches and trainers, [O'Loughlin's] odds of a full recovery are approximately 40%, her odds of a partial recovery (i.e., exacerbations at times of stress) approximately 40%, and her odds of developing a chronic illness, approximately 20%.
>
> 5. The longer [O'Loughlin] experiences Bulimia nervosa without achieving complete abstinence, the harder it will be to achieve a full and longstanding recovery.
>
> 6. Going forward, [O'Loughlin] will always be at risk for relapse due to the actions of USTA/USTAPD coaches and trainers.

(Sandolo Dec'l Ex. T).

      C.    <u>Reliability of Dr. Weiner's Causation Opinion</u>

Defendants argue Dr. Weiner's testimony regarding the precipitation and exacerbation of O'Loughlin's bulimia is impermissibly unreliable because it is based on his <u>ipse dixit</u> opinion rather than sufficient data. In particular, defendants point to Dr. Weiner's testimony that there is no way to measure, isolate, assign percentages to, or rule out other factors besides defendants' conduct that may have contributed to the onset or exacerbation of O'Loughlin's eating disorder with any degree of medical certainty. They argue this renders Dr. Weiner's testimony inadmissible. (Defs.' Br. at 23).

The Court disagrees.

The focus of the Court's inquiry is on the methodology employed by Dr. Weiner in reaching his conclusions, not on the conclusions themselves. See <u>Schoolcraft v. City of New York</u>, 2015 WL 6444620, at *2 (S.D.N.Y. Oct. 23, 2015) ("Only the methodology, not the district court's belief as to the correctness of such conclusions, is the focus of a <u>Daubert</u> inquiry.").

Here, Dr. Weiner's report states he relied on the following in reaching his conclusions: (i) O'Loughlin's medical records; (ii) USTAPD records and emails; (iii) deposition testimony; (iv) a 75-minute interview he conducted with O'Loughlin and her mother in September 2014 in connection with this case (<u>see also</u> Weiner Dep. at 41); and (v) medical articles and literature, abstracts of which were attached to his report, and which he apparently "supplemented" at a later date. (<u>Id</u>. at 55-56). In addition, at his deposition he stated his opinions were also based on his "thirty-five years of experience in the field." (<u>Id</u>. at 178).

These methods are generally acceptable bases for reaching an expert opinion related to a psychological condition. See <u>Schoolcraft v. City of New York</u>, 2015 WL 6444620, at *2

8

(admitting psychological diagnosis testimony based on "(i) a 90 minute interview with Plaintiff; (ii) review of depositions by the doctors that assessed Plaintiff at Jamaica Hospital; and (iii) review of medical records."); Tchatat v. City of New York, 2016 WL 4074112, at *4 (S.D.N.Y. July 14, 2016) (accepting the argument that "that it is generally accepted practice in the field of psychiatry for a diagnosis to be made based on an examination of the individual being assessed.").

However, based on a review of relevant cases, when a medical expert is asked to opine on causation, as distinguished from merely a diagnosis, the expert typically performs additional analyses or tests, such as a "differential diagnosis" test, to isolate other potential causes of the illness. See e.g., Munafo v. Metro. Transp. Auth., 2003 WL 21799913, at *18 (E.D.N.Y. Jan. 22, 2003) (excluding a psychopharmacologist's testimony because he did not perform a differential diagnosis analysis to eliminate other causes of plaintiff's depression); see also Mancuso v. Consol. Edison Co. of New York, 967 F. Supp. 1437, 1451 (S.D.N.Y. 1997).

No such additional analyses or tests were performed here.

When asked about this at his deposition, Dr. Weiner testified there are no tools or analyses that can be used in the field of psychiatry for quantifying or isolating the causes of an eating disorder. (Weiner Dep. at 58, 158-59, 183). Defendants have not introduced countervailing evidence that such tools exist. In fact, defendants appear to agree with Dr. Weiner's assertion that these tests are not available in his field. (See Defs.' Br. at 2, 17 ("Dr. Weiner . . . admitted (as he must) that the field of psychiatry does not allow him to assign any relative degree of importance to any individual factor . . . over any other factor.")). Defendants further note that their expert agrees with Dr. Weiner on this point: "the experts are in agreement

9

that no one factor in Ms. O'Loughlin's medical history may be isolated and identified as the cause of the exacerbation of her eating disorder." (Id. at 28).

In the absence of such tools, the Court finds Dr. Weiner's reliance on his experience, relevant literature, contemporaneous documents, including medical records, and an interview with plaintiffs, sufficient to render an expert opinion that will help the jury "to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702.

In particular, Dr. Weiner was able to opine that defendants' actions were a significant factor in bringing about or exacerbating O'Loughlin's eating disorder. Specifically, his opinion is that "when you induce negative energy balance [defined elsewhere as "not taking in adequate and sufficient calories for the amount of exercise that you're doing"] and dieting behaviors, you greatly increase the manifestation of the illness <u>regardless of whatever the rest of the template is</u>." (Id. at 33, 72) (emphasis added). Moreover, Dr. Weiner testified he considered O'Loughlin's other predisposing factors, and was able to conclude defendants' actions were likely the most significant factor in the exacerbation of her disorder. In particular, he specifically acknowledged that "there are a lot of . . . contributing variables . . . whether it's her anxiety or her depression or the divorce or all those sorts of things," and yet was able to opine that there is a "very high likelihood" that "the interventions of the [defendants] in the fall of 2011 while [O'Loughlin] was in residence" were the "key precipitating event[s] to her relapse." (Weiner Dep. at 237-38).

This is all that is required under Florida law, which both parties agree applies to the merits here. A plaintiff alleging negligence under Florida law "must introduce evidence which affords a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendant was <u>a substantial factor</u> in bringing about the result." <u>Guinn v. AstraZeneca Pharm.</u>

LP, 602 F.3d 1245, 1256 (11th Cir. 2010) (quoting Gooding v. Univ. Hosp. Bldg., Inc., 445 So. 2d 1015, 1018 (Fla. 1984)) (emphasis added).  Dr. Weiner has clearly testified that in his professional opinion, based on his review of the materials and interview of O'Loughlin, he believes defendants' actions are a substantial factor in the exacerbation of O'Loughlin's eating disorder.

Accordingly, based on the current record as presented by both parties, especially in light of the presumption of admissibility and defendants' ability to cross-examine Dr. Weiner fully at trial, the Court is satisfied that Dr. Weiner's testimony regarding the precipitation and exacerbation of O'Loughlin's eating disorder is admissible under Rule 702, as well as Daubert and its progeny.

D.   Relevance and Qualifications to Testify Regarding Communication and Education

Defendants argue the Court should exclude Dr. Weiner's second opinion regarding defendants' failure to "effectively communicate [or] educate their coaches and trainers to the fact that [O'Loughlin] had struggled with purging behavior/Bulimia nervosa." (Sandolo Ex. T).

The Court agrees Dr. Weiner is not qualified to opine on this topic.

 "Rule 702 requires a trial court to make an initial determination as to whether the proposed witness qualifies as an expert." Baker v. Urban Outfitters, Inc., 254 F. Supp. 2d at 352-53.  An expert is not qualified to testify on topics not within his or her area of expertise. See Morse/Diesel, Inc. v. Trinity Industries, Inc., 67 F.3d 435, 444 (2d Cir. 1995).

At his deposition, Dr. Weiner admitted he does not have any specialized degrees, certifications, or licenses in the field of tennis coaching or training.  He also stated he did not speak with any of O'Loughlin's coaches or trainers in forming his opinion regarding the insufficiency of defendants' communication or education of its coaching and training staff.  He

said only that his "opinion came from reading the depositions," which he agreed were the "sole basis on which [he is] prepared to opine as to what may or may not have been communicated or educated to" the coaches and trainers.  (Weiner Tr. at 106, 112-13).  He then stated he simply relied on an article he read, which was written by an "expert in training athletes," not psychiatry.  (Id. at 130-31).

Accordingly, the Court finds as a matter of law that Dr. Weiner is unqualified to testify regarding the second opinion in his report.

E.      Reliability of Dr. Weiner's Odds of Recovery Opinion

Defendants also argue in a footnote that the Court should exclude Dr. Weiner's fourth opinion, that O'Loughlin's "odds of a full recovery are approximately 40%, her odds of a partial recovery (i.e., exacerbations at times of stress) approximately 40%, and her odds of developing a chronic illness, approximately 20%." (Sandolo Ex. T).  They correctly point out that Dr. Weiner admitted at his deposition that the percentages he provides are "speculative." (Def. Br. at 25, n. 6).

Although Dr. Weiner backed away from the word "speculative" later in his deposition (see Weiner Dep. at 218 ("Mr. Rothman pointed out to me that the use of the term speculative, [h]as a legal meaning, that I never intended in my deposition.")), the Court agrees Dr. Weiner did not provide sufficient support for his conclusion regarding the specific percentages of recovery likelihood.  He stated only that the conclusion was based on his "clinical experience working in the field of eating disorders and those who get hospitalized or come into residential treatment and those – you know, so this my best guess at what [O'Loughlin] is looking forward to." (Weiner Dep. at 180).   He further reiterated it was based "on experience, not based on the literature." (Id.).  Also, Dr. Weiner did not provide any explanation for why he chose 40% and

not, for example, 39% or 41%.  His opinion therefore suggests specificity and accuracy where in fact it is not based on any empirical data.  In other words, Dr. Weiner's opinion on this topic amounts to ipse dixit, and is therefore inadmissible.  See Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

Accordingly, Dr. Weiner will not be permitted to testify regarding his "odds of recovery" opinion.

II.     Summary Judgment

Defendants argue plaintiffs are unable to raise a genuine issue of material fact as to causation because Dr. Weiner cannot conclude O'Loughlin's eating disorder was caused by defendants' conduct.

The Court disagrees.

A.      Legal Standard

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A fact is material when it "might affect the outcome of the suit under the governing law. . . .  Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party.  See id.  The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010) (citation omitted).  It is the moving

party's burden to establish the absence of any genuine issue of material fact.  Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case on which she has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323.  If the non-moving party submits "merely colorable" evidence, summary judgment may be granted.  Anderson v. Liberty Lobby, Inc., 477 U.S. at 249-50.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation."  Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011) (internal citations omitted).  The "mere existence of a scintilla of evidence in support" of the non-moving party's position is likewise insufficient; "there must be evidence on which the jury could reasonably find" for her.  Dawson v. Cty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party.  Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003).  If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper.  See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).

In deciding a motion for summary judgment, the Court need only consider evidence that would be admissible at trial.  Nora Bevs., Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).

B.     Causation

Applying these standards, the Court concludes the question of causation at issue in this case – whether defendants' conduct caused or exacerbated O'Loughlin's bulimia – is an issue of fact that must be determined by a jury.

Causation is an element in each of the three Florida law causes of action asserted by plaintiffs. (See Defs.' Br. at 27). Defendants argue the only evidence of causation proffered by plaintiffs is Dr. Weiner's testimony. They further argue that absent Dr. Weiner's testimony on this central element, defendants are entitled to summary judgment.

Because the Court has concluded Dr. Weiner may testify on the issue of causation, defendants' argument fails, and, accordingly, summary judgment is inappropriate.[1]

III.    Plaintiffs' Damages Claim

Finally, defendants seek to limit plaintiffs' damages claim to the time period between July 2011 and February 20, 2012. (Defs.' Br. at 29). They argue it is undisputed defendants are not responsible for the initial onset of O'Loughlin's bulimia in early 2011, and that defendants are not responsible for O'Loughlin's relapse and subsequent hospitalization in December 2012.

The Court finds plaintiffs have introduced sufficient evidence to put these dates in dispute. Plaintiffs contend, and their expert opines, that O'Loughlin's eating disorder was "triggered" in November 2010, when O'Loughlin met with a nutritionist hired by defendants at

---

[1] Defendants also argue that even if Dr. Weiner's testimony is not excluded, they are entitled to summary judgment because his testimony does not raise a question of fact as to causation since it fails to "afford[] a reasonable basis for the conclusion that it is more likely than not that the conduct of the defendants was a substantial factor in bringing about the result," as required under Florida law. (Defs.' Br. at 27-28 (quoting Gooding v. Univ. Hosp. Bldg., Inc., 445 So. 2d 1015, 1018 (Fla. 1984)). The Court has already addressed and rejected this argument in the context of the Daubert analysis supra.

15

the day program who initially recommended she lose weight.[2] (Pls.' Br. at 19). Plaintiffs and their expert further assert "the exacerbation of [O'Loughlin's bulimia] from mild to severe while in the USTA program renders her susceptible to relapse," precluding the end date limitation of damages sought by defendants as well. (Id.).

Accordingly, summary judgment on this issue is inappropriate.

---

[2] Although defendants are correct Dr. Weiner testified he does not believe defendants "caused" the initial onset of O'Loughlin's bulimia in early 2011, he also testified the contact with a nutritionist hired by defendants in late 2010 was a "precipitating factor" or "triggering event" leading to the development O'Loughlin's eating disorder. (Weiner Dep. at 61-62). Defendants will have a full opportunity to address this apparent discrepancy on cross-examination.

**CONCLUSION**

Defendants' motion to exclude plaintiffs' expert's testimony is GRANTED in part and DENIED in part.

Defendants' motion for summary judgment is DENIED.

Defendants' motion to limit plaintiffs' damages claim is DENIED.

All counsel are directed to appear for an in-person status conference on November 3, 2016, at 9:30 a.m., at which time the Court will set a trial date and a schedule for pretrial submissions.

By October 28, 2016, the parties shall submit a Joint Pretrial Order in accordance with the Court's Individual Practices.

The Clerk is instructed to terminate the motion.  (Doc. #56).

Dated:  September 28, 2016
        White Plains, NY

                            SO ORDERED:

                            _____
                            Vincent L. Briccetti
                            United States District Judge